**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAROL HARPER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **AETNA LIFE INSURANCE COMPANY** | : | **NO.   10-1459** |

**MEMORANDUM OPINION**

Savage, J.                                                                                    **March 31, 2011**

In this action brought pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) (2010), Carol Harper challenges Aetna Life Insurance Company's ("Aetna") denial of her claim for long-term disability benefits ("LTD").  She contends that Aetna wrongfully terminated her benefits.  The issue is whether Aetna acted arbitrarily and capriciously when it processed and denied her claim.

After a thorough examination of the administrative record and applying a deferential standard of review, we find that Aetna's determination that Harper was not impaired from performing her job duties as an executive assistant is not supported by substantial evidence.  Consequently, we conclude that Aetna acted arbitrarily and capriciously when it denied Harper's LTD benefits.  Therefore, judgment will be entered in favor of Harper and against Aetna, awarding Harper retroactive reinstatement of her LTD benefits.

**Background**

Harper worked as an executive assistant with CSL Behring, L.L.C. beginning in 2004.  As part of her employment, she was covered under a long-term disability plan ("Plan") governed by ERISA.

On June 19, 2008, Harper injured her lower back and was placed on short-term disability.  The following month, she returned to work on a part-time basis with restrictions.

Her primary care physician, Dr. Ranette Schurtz,[1] limited her to sedentary work four hours per day, three days a week, provided she stand and stretch every hour. Harper continued to work part-time until September 2008, when Dr. Schurtz placed her on full disability.

Harper received short-term disability benefits from June 23, 2008 through December 18, 2008.[2] Aetna denied her application for LTD benefits, relying on a record review performed by one of its staff physicians, Dr. James Wallquist. Based on its in-house physician's review, Aetna determined that there was insufficient "medical information supporting disability to be considered eligible for long-term disability benefits." According to Aetna, Harper was "not totally disabled from performing [her] duties" as an executive assistant.

Harper appealed Aetna's decision, claiming that her "severe low back pain and symptoms" prevent her from engaging in any gainful employment. In support of her appeal, she provided various medical documents, including treatment notes and letters from Dr. Schurtz, Dr. Howard Richter, and Dr. Matthew Budway.

On February 2, 2010, citing a record review by Dr. Judith Esman, Aetna denied Harper's appeal. It concluded that there was "insufficient medical evidence" to support Harper's request for LTD benefits. It conceded that she was disabled for up to six months following her May 14, 2009 lumbar fusion surgery; but, Aetna concluded she was not covered under the Plan at that time because she was no longer employed by Behring.

The parties have filed cross-motions for summary judgment. Harper claims that Aetna's decision was arbitrary and capricious, and seeks an award of LTD benefits. Aetna

---

[1] Dr. Schurtz specializes in Family Medicine/General Practice.

[2] Harper received partial short-term disability benefits while working part-time.

argues, of course, that substantial evidence in the administrative record supported its decision.

## ERISA Standard of Review

The denial of benefits under an ERISA qualified plan is reviewed using a deferential standard. Where the plan administrator has discretion to interpret the plan and to decide whether benefits are payable, the exercise of its fiduciary discretion is judged by an arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989). A court may not substitute its judgment for that of the administrator. *Vitale v. Latrobe Area Hosp.,* 420 F.3d 278, 286 (3d Cir. 2005) (quoting *Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)). Accordingly, in deference to the plan administrator, the decision will not be reversed unless it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009).

In conducting the review, we examine the structural and the procedural components of the decision-making. *Miller v. Am. Airlines, Inc.,* 632 F.3d 837, 845 (3d Cir. 2011). The structural inquiry looks at how the plan is funded to determine if there is a financial incentive to deny claims. *Id.* The procedural inquiry focuses on how the administrator processed the claim to insure that the procedure was fair and impartial. *Id.* (citations omitted).

A financial conflict arising from the administrator's dual role as evaluator and payor of claims no longer may be used to raise the level of scrutiny. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). See *Doroshow*, 574 F.3d at 233-34; *Schwing v. The*

*Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). Nevertheless, it remains a factor to consider along with other factors in determining whether there has been an abuse of discretion. *Ellis v. Hartford Life and Accident Ins. Co.*, 594 F. Supp. 2d 564, 566-67 (E.D. Pa. 2009).

Here, there is no dispute that Aetna, as insurer for the Plan, both funded and administered the award of disability benefits. Therefore, we shall consider the conflict as one, but not significant, factor in determining whether there has been an abuse of discretion.

In addition to the structural inquiry, we review procedural factors in the administrator's processing of the claim. *Miller,* 632 F.3d at 845; *Post v. Hartford Ins., Co.,* 501 F.3d 154, 164 (3d Cir. 2007)*.* Procedural irregularities in the review process cast doubt on the administrator's impartiality. *Miller,* 632 F.3d at 845. Procedural anomalies that call into question the fairness of the process and suggest arbitrariness include: reversing a decision to award benefits without new medical evidence to support the change in position, *id.* at 848*;* relying on the opinions of non-treating over treating physicians without reason, *Kosiba v. Merck & Co.*, 384 F.3d 58, 67-68 (3d Cir. 2004); *Ricca v. Prudential Ins. Co. of Am.,* No. 08-257, 2010 WL 3855254, at *7 (E.D. Pa. Sept. 30, 2010); failing to follow a plan's notification provisions, *Lemaire v. Hartford Life & Acc. Ins. Co.*, 69 F. App'x 88, 92-93 (3d Cir. 2003); failing to comply with the notice requirements of § 503 of ERISA by not giving specific reasons for the denial, *Miller,* 632 F.3d at 852; conducting self-serving paper reviews of medical files, *Post*, 501 F.3d at 166; failing to address all relevant diagnoses before terminating benefits, *Miller,* 632 F.3d at 853; relying on favorable parts while discarding unfavorable parts in a medical report, *Post*, 501 F.3d at 165; denying

benefits based on inadequate information and lax investigatory procedures, *Porter v. Broadspire*, 492 F. Supp. 2d 480, 485 (W.D. Pa. 2007); ignoring the recommendations of an insurance company's own employees, *Post*, 501 F.3d at 165; imposing requirements extrinsic to the plan, *Miller*, 632 F.3d at 849; and, failing to consider the claimant's specific job requirements under an "own occupation" policy, *id.* at 855.

A procedural anomaly may also arise if an insurer provides its outside consultant, who is offered as independent, with information that "alert[s] him to what [the insurer] had decided and why" so that he knows where the insurer was heading. *Morgan v. Prudential Ins. Co. of America*, __F. Supp. 2d__, No. 10-1000, 2010 WL 4665951, at *7 (E.D. Pa. Nov. 18, 2010).

The claims process is viewed in its entirety. Each factor is evaluated in the context of the case. Any one factor may, but not always, compel a finding of arbitrariness. More than one irregularity suggests a biased process. Thus, we must weigh all factors together. *Glenn*, 55 U.S. at 117.

### Evidence Available to Aetna

On December 10, 2008, Harper's LTD claim was reviewed by an Aetna staff physician, Dr. James Wallquist, a board certified orthopedic surgeon. He reviewed Harper's medical records, including those of her treating physicians. These records included: Dr. Schurtz's physician statements from July 6 and August 13, 2008, diagnosing Harper with a disc herniation and restricting her to sedentary work three days a week, four hours per day, and advising that she must stand and stretch every hour; Dr. Schurtz's physician statements from September 12 and October 9, 2008, diagnosing Harper with a disc herniation and finding that she has no work capacity; an October 23, 2008 letter from

neurosurgeon Dr. Howard Richter to Dr. Schurtz reporting "no significant disc herniation," but finding that Harper had a grade one spondylolisthesis and mild stenosis at L4-L5; an X-ray image from September 10, 2008, showing a "grade 1 anterolisthesis of L4 on L5," "mild disc space narrowing at L4-L5 and L5-S1," and "[d]egenerative change" in the "sacral iliac joints"; and, an MRI dated June 23, 2008, finding, among other things, that there is no herniated disc, but "L4-L5 levels show diffuse bulging annulus fibrosis with posterior joint hypertrohy causes peripheral stenosis." After reviewing Harper's medical records and talking to Dr. Schurtz, Dr. Wallquist wrote that "there were insufficient quantitative physical examination findings to correlate with the diagnostics and the claimant's subjective complaints to support the restrictions and limitations imposed by Dr. Schurtz as being appropriate." He then concluded that "the documentation does not support the restrictions and limitations that would impair [Harper] from returning to work full-time duty at this time."

In its December 15, 2008 letter denying Harper's LTD benefits, Aetna relied on Dr. Wallquist's record review to conclude that there was insufficient medical documentation to support her disability. According to Aetna, Harper was not disabled and was able to perform her duties as an executive assistant.

Six months later, on May 14, 2009, Harper underwent lumbar surgery.[3] On November 5, 2009, Harper appealed Aetna's decision denying her benefits, contending that her "severe low back pain and symptoms" prevent her from engaging in any gainful employment. In support of her appeal, she provided various documents from her treating physicians, including numerous notes, letters, and physician statements from Dr. Schurtz,

---

[3] Dr. Budway performed "[d]ecompressive lumbar laminectomy, L4-L5, with partial facetectomies, bilateral foraminotomies, with decompression of the bilateral L4 and L5 nerve roots . . . and placement of nonsegmental pedicle screw fixation, L4-L5, and placement of posterolateral morselized autograft."

covering the period before her back surgery. These records include a February 13, 2009 letter in which Dr. Schurtz advised Aetna's claim services representative, Renee Michaud, that Harper continued to have "pain in her low back that radiates down her right leg." She found that Harper's pain "is enough to prevent her from walking more than ½ block, sitting for more than 45 minutes at a time or lifting more than 10 pounds." Dr. Schurtz considered Harper "disabled and unable to work in her field (or any field) requiring sitting or walking for long periods or lifting without reasonable accommodation." (emphasis omitted).

In another letter to Michaud, dated February 21, 2009, Dr. Schurtz noted that Harper was planning on having back surgery and listed specific restrictions that prevented her from working. She noted that Harper could not sit for more than 30 minutes "without pain or leg parasthesis"; could not walk more than 30 feet "without pain or leg parasthesis"; and could not lift, push or twist "greater than 12 pounds."

In an October 13, 2009 letter, Dr. Schurtz provided a detailed summary of the treatment she had provided Harper ("Summary Letter").[4] The Summary Letter chronicled each of Harper's office visits, describing her symptoms, physical condition, and course of treatment. Dr. Schurtz also noted that the restrictions she had imposed for Harper "were not accommodated [by her employer], and these restiction[s] could have aided in her ability to work."

Harper also provided an October 13, 2009 functional capacity questionnaire from Dr. Schurtz, diagnosing her with disc degeneration and herniation. The questionnaire

_____

[4] In the first paragraph of the Summary Letter, Dr. Schurtz stated that she was "asked to write a summary letter on behalf of Carol Harper for preparation of her upcoming long term disability benefits evaluation." The letter is a summary of the care she has "personally given and the care she has coordinated with [Harper's] specialists." R. 57.

noted that Harper has "numbness, weakness and limited mobility," as well as "objective pain" when sitting more than one hour.  Her pain is "constant and radiating" to her right hip, leg, and abdomen, and is "equivalent to 9/10 with sitting and 8/10 standing."  In the questionnaire, Dr. Schurtz checked off "[r]educed range of motion," "abnormal gait," "sensory loss," "tenderness," "muscle spasm," "muscle weakness" and "impaired sleep" as "objective signs" of Harper's pain.  She also reported that Harper can walk less than one block without rest or severe pain; can sit for one hour at a time; can sit, stand or walk less than two hours in an eight hour work day; must walk for 15 minutes every hour; must take breaks for 15 minutes every hour; can occasionally lift less than 10 pounds, but never more; can never stoop, crouch or climb ladders; and, can only occasionally twist and climb stairs.  She also reported that Harper would likely be absent from work more than four days per month as a result of her condition.

The appeal also included letters from Dr. Budway, her orthopedic surgeon.  In his May 14, 2009 operative report, he stated that Harper has "a long standing and progressive history of progressive back pain and bilateral lower extremity pain and distal motor weakness."  The operative report also noted that an MRI revealed "significant lateral recess stenosis and grade 1 spondylolisthesis at L4-5."

There are several post-operative letters from Dr. Budway, including a June 8, 2009 letter to Dr. Schurtz reporting that Harper was "doing quite nicely" and had no back or leg pain three weeks after her lumbar surgery; a July 20, 2009 letter noting that Harper "continues to make very nice progress" and had no back or leg pain; and, a September 17, 2009 letter advising that Harper was continuing to do "quite nicely" and had no back or neck pain.

In his October 9, 2009 letter to Dr. Schurtz, Dr. Budway noted that Harper "continues to make slow and steady progress following . . . surgery." It also reports that Harper has "residual back and leg pain." Dr. Budway supplemented the October 9, 2009 letter with a November 2, 2009 addendum, advising that Harper has a "fairly significant spondylosis within the lumbar spine including a rather dramatic L4-5 spondylolosthesis." The addendum notes that sitting for "extensive periods of time" would be just as "deleterious to the low back as would standing or walking on a regular basis." Despite his patient's progress, Dr. Budway reported that since he began treating her in October 2008, she has been "physically unable to perform a sedentary (secretarial) job on a full-time basis." He recommended that she pursue a different line of work.

Dr. Budway completed a November 2, 2009 functional capacity questionnaire in which he reported a diagnosis of lumbar spondylolisthesis. His diagnosis was confirmed on an MRI as a "clinical finding[ ]" supporting the diagnosis. He identified Harper's symptoms as back pain, leg pain, and leg weakness. The surgeon found his patient to have "[r]educed range of motion," "abnormal gait," "sensory loss," and "muscle spasm" - "objective signs" of her condition. He reported, from his own examination and treatment of his patient before and after her back surgery, that she can walk less than one block without severe pain; cannot sit longer than 30 minutes, cannot stand more than 15 minutes; can only sit, stand and walk less than two hours in an eight-hour work day; needs to walk for 10 minutes every 30 minutes; needs to take a 15 minute break every hour; can occasionally lift less, but never more, than 10 pounds; cannot twist, stoop, crouch, or climb ladders; and can climb stairs only occasionally. Her pain would "frequently" interfere with her attention and concentration during a typical work day.

The questionnaire solicited the physician's opinion as to how often the patient's impairments would "likely" result in her being absent from work. It provided a range from "never" to "more than four days per month." Dr. Budway checked off the maximum option available – more than four days a month. He did not limit the number of days to five or any other number. Significantly, he concluded that Harper could not perform "any gainful employment on a continuous and sustained basis," ruling out even sedentary work.

In an earlier "Residual Functional Capacity Questionnaire" prepared on August 13, 2009, Dr. Schurtz, based upon the same findings and her personal observations, had also concluded that Harper was unable to "work at a regular job on a sustained basis."

Harper provided a February 25, 2009 letter from Dr. Bradley Smith[5] to Dr. Schurtz, reporting that Harper has "very good lumbar flexion and limited lumbar extension." Dr. Smith also found "positive discomfort in log-roll of the right hip," and "positive pain with passive internal rotation of the right hip." He diagnosed Harper with "[r]ight hip arthritis" and "[l]umbar degenerative disc disease."

Aetna hired Dr. Judith Esman to review Harper's medical records. Dr. Esman is board certified in physical medicine and rehabilitation, pain medicine, internal medicine, and electrodiagnostic medicine. After reviewing Harper's records, Dr. Esman found that "repeated physical examinations by several physicians repeatedly showed an entirely normal neurologic examination and normal range of motion of her lumbar spine." She asserted that "objective examination findings fail to corroborate impairment from the period 6/19/08 through the surgery in May 2009." According to Dr. Esman, "based purely on

---

[5] Dr. Smith specializes in sports medicine, non-operative orthopaedics.

objective examination findings, it is not possible to establish any impairment during these time periods, from a physical/musculoskeletal standpoint." However, she did acknowledge that Harper would have had a temporary period of disability three to six months after her lumbar surgery.

Dr. Esman opined that the restrictions imposed by Dr. Schurtz prior to surgery were not reasonable. Specifically, she found that there was "no evidence" to support Dr. Schurtz's conclusion that Harper was "not capable of any gainful employment." She also disagreed with Dr. Schurtz's initial restrictions limiting Harper to working four hours a day, three days a week. According to Dr. Esman, "[t]here is no evidence supported in this record that [Harper] would not be capable of full-time sedentary work."

Dr. Esman did acknowledge that "based on [Harper's] degenerative disc disease and anterolisthesis that was documented on her imaging studies, it does seem reasonable that she would have increased discomfort with extended sitting without changes in position." She then advised that "despite the lack of physical exam findings corroborating impairment, it would be appropriate to apply some restrictions/accomodations for the claimant from the period of 6/19/08 until the time of her surgery." The accommodations include allowing Harper to "change position ad lib and to get up and stretch and walk around for a couple of minutes after sitting 30 minutes." She also found it reasonable that Harper be provided with an ergonomic chair and work station, and a maximum lifting restriction of 20 pounds.

With respect to Harper's post-surgery condition, Dr. Esman disagreed with Dr. Budway's conclusion that she had no work capacity. Dr. Esman noted that Harper had "some difficulty understanding [Dr. Budway's] conclusion given what appears to be, at least

initially, a favorable outcome after her surgery." According to Dr. Esman, "one [could] conclude that after a period of recovery from her operation that she would be better off than before the operation." She found that "[t]here is insufficient medical information of any objective physical findings after the surgery to support that [Harper] has any ongoing impairments or restrictions following her recovery from her surgery."

Based on Dr. Esman's record review, Aetna denied Harper's appeal. It concluded that there was "insufficient medical evidence to support Ms. Harper's disability as of December 20, 2008." Aetna did agree that Harper suffered a period of disability for up to six months after her surgery and none after that post-operative period.

### Aetna's Treatment of the Evidence

The issue is whether, based on this record, there was substantial evidence from which Aetna could have reasonably concluded that Harper was not disabled from her job as an executive assistant. Aetna concluded that Harper was not impaired by her condition, and could work full time with limited restrictions. Therefore, we shall consider the evidence that it relied upon in reaching this conclusion in order to determine if it acted arbitrarily.

### The Medical Experts

In light of Aetna's reliance on the opinions of its staff physician and its hired consultant, we shall examine how it viewed their conclusions in comparison with those of Harper's treating physicians. In doing so, we look to the bases of their respective opinions, the extent of their analyses, the information available to them, and their treatment of that information.

If Aetna accorded undue deference to the opinions of consultants who never examined Harper, or gave them, without a sufficient basis, substantially more weight than

12

the conclusions of Harper's treating physicians, a procedural anomaly arises. *Kosiba*, 384 F.3d at 67-68. If its consultants' opinions are not founded on reliable evidence, they will not be given conclusive effect. *Addis v. Ltd. Long-Term Disability Program*, 425 F. Supp. 2d 610, 617 (E.D. Pa. 2006).

Dr. Wallquist's opinion that there was "insufficient physical examination findings to correlate with diagnostics and the claimant's subjective complaints" is not supported by substantial evidence. On the contrary, the evidence available to Aetna suggests otherwise. The documents reviewed by Dr. Wallquist are replete with physical findings supporting Harper's impairment. Dr. Schurtz's July 6, 2008, physician statement diagnosed Harper with a disc herniation and found that she was suffering from back pain and numbness. She listed MRI findings as objective diagnostic evidence. In her August 13, September 12, and October 9, 2008 physician statements, Dr. Schurtz reported that Harper had pain, numbness and weakness. The September 12 and October 9 statements listed "numbness, weakness, and foot drop"[6] as objective findings of impairment.

Dr. Schurtz found that as of August 13, 2008, Harper had "weakness in her right foot that only seemed to occur on the days she worked her 4 hour shifts." On these days, "she also had worsening numbness in her groin and abdomen." Dr. Schurtz predicted that if her symptoms do not improve in two weeks, "surgery should be reconsidered."

Three weeks later, on September 8, 2008, Harper's symptoms were "getting worse," and she had "[w]eakness in her entire right leg and . . . has trouble walking." According to Dr. Schurtz, "sitting for long periods of [time] with poor ergonomic support was worsening

---

[6] "Foot-Drop" is defined as "[p]aralysis or weakness of the dorsiflexor muscles of the foot and ankle, as a consequence of which the foot falls, the toes dragging on the ground in walking, usually due to injury of the peroneal nerve." STEDMAN'S MEDICAL DICTIONARY 604 (25th ed. 1990).

her symptoms."

As of November 24, 2008, Dr. Schurtz considered Harper "completely disabled from work." Consequently, she advised her that "she could not work at all at [her] current position" or at any job that required four hours of sitting more than twice a week.

Dr. Wallquist ignored Dr. Schurtz's office note dated November 24, 2008, in which she reported that Harper continues to have pain in her lower back and two epidural injections "did not help." Dr. Schurtz also noted that Harper is "far from healed," and is "not ready for full time work."

Dr. Wallquist's rendition of his conversation with Dr. Schurtz reveals that he selectively included in his report only those portions that cast doubt on disability. He referenced Dr. Schurtz's early opinions without discussing her final conclusion. He cites Dr. Schurtz's opinion that Harper was able to return to work on a trial basis in a sedentary job, but her employer would not accommodate her. This statement, although accurate, was incomplete; and, without context, it is misleading. In her Summary Letter, Dr. Schurtz explained that her patient's relief from symptoms was because she was no longer working. She warned that her symptoms would recur if she returned to work. Looking at Dr. Schurtz's documentation in its entirety and not just those parts cited by Dr. Wallquist reveals that he mischaracterized her opinions and notes.

Dr. Schurtz, having been advised of Dr. Wallquist's opinion citing a lack of documentation, conceded that she could have "documented it more specifically." She explained that although she had noted full range of motion and lack of spasm, these movements were "always with pain." She emphatically stated that after seeing and physically examining her patient over a year and a half, she concluded that Harper was

"unable to perform her duties as a secretary, and [was] unemployable until her pain was addressed with surgery."

Dr. Schurtz's Summary Letter references her peer-to-peer telephone conference with Dr. Wallquist, revealing Wallquist's later mischaracterization of her findings. According to Dr. Schurtz, she "attempted to explain that [Harper's] numbness had resolved because she has in fact not been working or sitting for hours at a time." She also told Dr. Wallquist that "once [Harper's] decompression therapy was halted and she started to work and sit for 8 hours per day, the numbness would return," and that "her employer was not accommodating her restrictions." According to Dr. Schurtz, "Dr. Wallquist was insistent that [Harper] was employable." So emphatic was Dr. Schurtz to the contrary that she requested that her disagreement "be documented" in his report.[7] It was not.

Dr. Wallquist rejected Dr. Schurtz's conclusion, citing insufficient physical evidence to support Harper's "subjective complaints." No one has questioned the legitimacy of Harper's back and leg pain. Even Dr. Esman acknowledged that based on Harper's condition, it was "reasonable that she would have increased discomfort with extended sitting without changes in position."

Instead of addressing Dr. Schurtz's prognosis that Harper's disabling symptoms would recur once she resumed her job duties, Dr. Wallquist glossed over it. He chose to select those parts of Dr. Schurtz's findings that supported his position and ignore those that did not. He also misstated her findings.

Dr. Wallquist's unsupported conclusion that Harper was not impaired is not reliable

---

[7] Dr. Wallquist's report notes that Dr. Schurtz believes that Harper could only return to work part time, otherwise she will "end up in same position with pain radiating down leg."

or credible in light of the objective physical findings to the contrary and Dr. Schurtz's explanation that returning to work would exacerbate her symptoms. Thus, Aetna's reliance on Dr. Wallquist's conclusions, without examining them in comparison with Harper's treating physician's opinions and findings, was arbitrary.

Aetna also relied on Dr. Esman's record review in denying Harper's appeal. In her report, Dr. Esman rendered what she called a "split decision." She opined that Harper had functional impairments from her May, 2009 back surgery to about three to six months postoperatively, but none before and after this three-to-six month period. She reached her conclusion "based purely on objective examination findings" which she did not "establish any impairment during these time periods, from a physical/musculoskeletal standpoint." At the same time, Dr. Esman acknowledged that "there is insufficient documentation regarding [Harper's] postoperative status to determine her clinical condition." Yet, she nevertheless claimed additional documentation would not assist her in assessing the claimed functional impairment. Despite her admitted lack of sufficient evidence, she still opined that Harper was not disabled.

As Aetna's other consultant did, Dr. Esman mischaracterized Dr. Schurtz's findings as based solely on subjective complaints. According to Dr. Esman, the restrictions imposed by Dr. Schurtz were "based on Ms. Harper's subjective complaints of increased leg symptoms and back pain when seated for an extensive period of time." On the contrary, Dr. Schurtz's records show that she consistently found objective evidence of Harper's impairment. Her July 6, 2008 physician statement listed an MRI as objective evidence of her diagnosis. Her later statements, dated September 12 and October 9, 2008, reported "numbness, weakness, and foot drop" as objective findings of impairment. The August 13,

2008 functional capacity questionnaire completed by Dr. Schurtz listed numbness, weakness, limited mobility and an MRI as clinical findings supporting Harper's impairment. The questionnaire also notes that Harper experiences "objective pain with sitting greater than 1 hour," and has "[r]educed range of motion," "abnormal gait," "sensory loss," "tenderness," "muscle spasm," "muscle weakness" and "impaired sleep." Dr. Schurtz listed these as "objective signs."

Dr. Esman's conclusions that there were insufficient "objective examination" findings to support Harper's impairment prior to surgery is not backed by substantial evidence. As discussed above, Dr. Schurtz's physician statements leading up to Harper's surgery repeatedly documented objective findings. Harper's other physicians also reported objective physical findings. In letters to Dr. Schurtz dated October 23, 2008, and February 19, 2009, Dr. Richter reported that an X-ray and an MRI show that Harper has spondylolisthesis. Dr. Budway confirmed Harper's spondylolisthesis in a February 19, 2009 letter, and in his May 14, 2009 operative report. He also found that she had weakness in her lower extremities. There is also a January 20, 2009 MRI showing, among other things, an "L4-5 grade I anterolisthesis on a degenerative basis."

Dr. Esman disregarded this evidence. Instead, she relied on the fact that "repeated physical examinations by several physicians repeatedly show[ ] an entirely normal neurologic examination and normal range of motion of the lumbar spine." Dr. Esman ignored the functional capacity questionnaires completed by Dr. Budway and Dr. Schurtz. In those questionnaires, both physicians checked off "[r]educed range of motion" as an objective sign of Harper's pain. Dr. Esman also ignored or disregarded Dr. Schurtz's Summary Letter, which indicated that Harper would only have a full range of motion with

pain, and Dr. Smith's finding that she had "limited lumbar extension."

With respect to Harper's post-surgical condition, Dr. Esman's opinion that "[t]here is insufficient medical information . . . to support that she has any ongoing impairments or restrictions" is not credible. She bases this conclusion on the fact that Dr. Budway's records initially "indicate[d] that she had a favorable response to the operation and that she had . . . a marked decrease in pain." Dr. Esman specifically references a July 20, 2009 letter from Dr. Budway to Dr. Schurtz, reporting that Harper was recovering from surgery and had no back or leg pain at that time.

Indeed, Dr. Budway did note that his patient was making good progress after surgery. Dr. Esman's reference is correct; but, it is misleading. Dr. Esman does not mention Dr. Budway's later notes reporting a deterioration in his patient's condition and an increase in her pain, and his determination that she could not work at a sedentary job. This omission displays a biased approach that appears calculated to justify a predetermined conclusion.

Without mentioning the changes in Harper's symptomatology over the course of several months post-surgery, Dr. Esman dismissed Dr. Budway's disability opinion by saying she had "difficulty understanding" it in light of Harper's "favorable response" to the surgery. Her "difficulty" arises from her failure to consider the entire course of treatment after the initial progress. In other words, Dr. Esman relied only on those parts of the record that supported her opinion while ignoring those that did not. Aetna, in unqualifiedly accepting Dr. Esman's opinion, also ignored those parts of the medical records that supported a finding of disability.

Dr. Budway's July 20 letter does not report if or when Harper would be able to return to work. It simply updates the status of her symptoms and recovery. In his October 9,

2009 letter, he reported that Harper has "residual back and leg pain." He also warned that "with [her] underlying condition and subsequent surgery, the long term prognosis is . . . always impossible to predict." Indeed, he reported that "it is known with this disorder . . . [that] future surgical treatment may be deemed necessary," and that "[m]ost likely [Harper] will require future treatment." Thus, although Dr. Budway's July 20 letter may have shown that Harper was initially improving after surgery, there was no guarantee that she would continue to do so.

Dr. Esman's conclusion that three-to-six months after her surgery, Harper could return to work full time as an executive assistant with minimum restrictions is contradicted by her own admission that "[t]here is insufficient documentation regarding the claimant's postoperative status to determine her clinical condition." Despite this admission, Dr. Esman did not speak with Harper or request a physical exam to get a complete clinical picture. Yet, even though she conceded she did not have sufficient information to render a meaningful medical opinion on Harper's condition, she gave one anyway. Aetna then accepted it. Given Dr. Esman's acknowledgment that she did not have sufficient information, Aetna could have requested a physical examination to provide it. Instead, it used Dr. Esman's report to justify its denial.

The fact that Dr. Esman did not examine Harper is a factor in analyzing the differences between her opinion and those of Harper's treating physicians. The insurer has no obligation to have an insured examined by a physician. However, where the insured's treating physician's disability opinion is unequivocal and based on a long-term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny

benefits.  *Kaufman v. Metro. Life Ins. Co.,* 658 F. Supp. 2d 643, 650 (E.D. Pa. 2009).

The value of a physical examination to a reliable assessment of the patient's disability is clear from Dr. Schurtz's comments on Dr. Wallquist's review and conclusions. She conceded that her documentation could have been more specific.  But, she emphasized that her findings and conclusions were based on her personal observations and examinations over a period of eighteen months.  She wrote, "I layed eyes and hands on her and feel I saw a patient unable to perform her duties as a secretary, and unemployable."

Aetna relied on Dr. Esman's record review in determining that Harper was not impaired prior to her surgery and was disabled only three-to-six months following her surgery, and disregarded the contradictory findings of Drs. Schurtz and Budway that Harper's back condition prevented her from working as an executive assistant.  Dr. Schurtz has been Harper's primary care physician since March 2008.  Dr. Budway had been treating her since October of 2008, and performed lumbar fusion surgery.  Dr. Esman made no attempt to reconcile her conclusion with the unequivocal, contradictory opinions of Harper's long-time physicians.  Nor did Aetna.  The administrator's accepting its consultant's opinion over the insured's treating physician's without explaining in a meaningful way why it did so demonstrates a bias to deny the claim.

Dr. Esman's conclusion that Harper was not impaired from performing her duties as an executive assistant misconstrues and disregards the findings of Dr. Schurtz, discredits contrary conclusions of Dr. Budway, and ignores objective physical evidence pointing to a reduced range of motion.  It is also undermined by her admission that "[t]here is insufficient documentation regarding the claimant's postoperative status to determine her clinical

condition." Aetna's acceptance of Dr. Esman's findings, without explaining why it accepted them over Harper's treating doctors, suggests that it was searching for a reason to deny her benefits.

Based on the evidence in the record, Aetna's decision to credit the unsupported opinions of Drs. Wallquist and Esman over those of Drs. Schurtz and Budway was not reasonable. Aetna's decision strongly suggests a procedural bias. It did not explain why it chose to ignore the credible findings of Harper's long-time treating physicians. Aetna's selectivity in what medical evidence it accepted and what it rejected or ignored casts doubt on the fairness of the decision-making process.

## Conclusion

Considering the administrative record and applying a deferential standard of review, we find that Aetna's decision to deny Harper LTD benefits is not supported by substantial evidence. Instead, it was arbitrary and capricious. Therefore, Harper's motion for summary judgment will be granted and Aetna's motion for summary judgment will be denied.